Welcome to the United States Court of Appeals for the Fourth Circuit. We have four cases on this morning. First up, 23-2069, Alfaro-Zelaya v. Bondi. Mr. Sangueza, or Miss, sorry, my apologies. Edith Sangueza Good morning, Your Honors, and may it please the Court. My name is Edith Sangueza. I'm an attorney from the Center for Gender and Refugee Studies appearing pro bono for petitioners, Miss Alfaro-Zelaya and her daughter, with my colleague Anne Peterson. I'm prepared to discuss the issue of nexus as to asylum and withholding. Miss Peterson will be addressing the Convention Against Torture. No woman says no to me. Those are the words from the persecutor's mouth. That's why Miss Alfaro-Zelaya's persecutor, Roberto, harassed, stopped, attempted to kidnap her, threatened to kill her and her son and dismember her daughter. The Board's decision denying asylum and withholding comes down to the issue of nexus. So on asylum and withholding, that's really the only issue before this Court. And under the statute and this Court's precedent, that standard is clear and it's uniform. The petitioner must show at least one central reason for their persecution has to be because of a protected ground. The question the agency must have asked is why Roberto targeted Miss Alfaro-Zelaya and not another person for persecution. And on this record, Roberto's own words and actions show that he targeted Miss Alfaro-Zelaya because of her sex and his view, consistent with country conditions evidence about Honduran culture and society, that Honduran women had to submit to him. But despite these words... And so what's the evidence of that, that he said that, or there otherwise evidence in the record to say what you just stated? Yes, Your Honor. So on page 180 of the joint appendix, he said, no woman says no to me. That's a generic statement about women, not Honduran women. Your Honor, I think if you combine it with the country conditions evidence about Honduran women, which the agency has to consider the full factual context under Alvarez-Lagos, there are many, many sites about a culture of machismo, a culture of violence against women that there are... Well, that may be, and that's quite unfortunate. I don't necessarily disagree with you, but how is that tied into his particular obsession with this particular woman? It's because he's telling her that he has the right to her body, basically, and the right to control her. Sure. I mean, clearly he said that, but he could have said that to any woman, could have the fact that he just happened to be, they happened to be in Honduras, and that's enough. If so, it would seem to me that every Honduran woman who was the victim of an obsessive man, and again, I'm not condoning that, would have a valid claim for asylum, but that's not the law, is it? Your Honor, I disagree. Is it? Is that the law? Any Honduran woman? No, Your Honor, that's not the law. But I'd like to go back to the But the law, the way the law is written, it is not an open-ended statute. It is designed to grant asylum to very particular groups, and not just to anyone, and that's why you have a nexus requirement, and that's why you have these particular groups listed, and it's just very particularized, and there are, unfortunately, men all over the world who offer, you know, make sexual overtures or attempt sexual advances, and they are rejected, and then they become angry about it and obsessive, and that's a very unfortunate thing. It's regrettable that that happens, but it's a worldwide phenomenon, and the busting up of romantic relationships and rejections of sexual advances and overtures, as I say, it's terribly unfortunate, but unfortunately for you, the statute is written in a particularized way, and what you're talking about is a universal phenomenon, which would be as broad as all outdoors. As my good colleague, the Chief, says, this is not particular to Honduras. It could have happened any time at any place. Your Honor, I think I have two points on that. So first, the cognizability of the particular social groups of Honduran women and unmarried Honduran mothers, the board didn't decide on those. They assumed they were cognizable for the purposes of their decision, so their decision is about nexus, so I think the cognizability of the particular social groups is to the side, but I do think on the statute, for example, race and religion, those are extremely broad categories, right? There are billions of Christians in this world, but someone can prove asylum on the basis of their Christianity if they prove the other elements of the asylum claim. We have not spoken to the extent in the immigration context on how gender factors in the persecution. Title VII is an area in which we have directly spoken on it, and to what extent should we look to Title VII, since we have nothing here, which in essence presumes the harassment of a person on the opposite sex is presumptively on behalf of the gender of the sex of the person. That is an indication of a nexus-type analogy in the Title VII area that we could, I think we could, but what is your perspective on that? Yes, Your Honor, I agree, and I think as Your Honor said, Title VII has that because of or on account of a similar nexus standard, so for example, if a male employer is harassing his female subordinate because he wants to have sex with her, he couldn't say, oh, that's not, I'm not, that's not sexual harassment, it's just that one particular lady that I work with, right, that is definitively sexual harassment, and so I think that is kind of similar to the situation here, where he says directly to her, no woman says no to me. Is it a factual determination, or is it a legal determination? On the issue of nexus, so I think there's two issues here with the nexus. So first, the board's decision isn't supported by substantial evidence, and in fact, I think substantial evidence on this record compels a finding of nexus to the assumed cognizable particular social group of Honduran women, unmarried single mothers, and that's so because of his words to her, no woman says no to me, which has to be viewed in the context of women are systematically mistreated, disenfranchised, violence against them is not even recognized by the judicial system. So does it matter that the petition is a Honduran woman, or is it because she's a woman? So it's Honduran women, and I think the issue of his sexual romantic interest in her, that's part of the nexus to Honduran women. The fact that he feels entitled to her, and that he feels entitled to do this harm against her, is because it's in the context of Honduran women, and I think, Your Honor, Judge Diaz, to your point, I mean, he wouldn't do this to a tourist French or American woman in Honduras, because it's Honduran women who are subjugated, and... Well, that is not clear. I mean, he does, she lives in Honduras, but that doesn't automatically make it that particularized. I think I'm, maybe the same concern has been expressed by my other colleagues, but it just seems to me that there are other avenues to correct this kind of behavior, including a criminal prosecution, if someone oversteps the proper bounds and visits violence or whatever, or maybe a Title VII prosecution, which just asks whether there's sexual discrimination on the part of someone, or what have you, or maybe a civil tort, or assault and battery, or whatever. I mean, there seem to be a lot of other vehicles for this under civil law, and under criminal law, if the basis of the grounds are overstepped here, but, you know, asylum is not an omnibus statute, and it's not a backup in case of a, what I'm saying is, other forms of litigation and other vehicles for bringing this complaint seems to exist, and the fact that you didn't choose one of those doesn't mean that the asylum statutes are sort of omnibus backups. Your Honor, if I may speak to that, so I think the Herman Storfer Declaration, which is in the record, which was not considered by the agency, for example, Joint Appendix 2033, she is a Honduran attorney, she's talking about the police, the judiciary, and explains that all those institutions in Honduras are completely ineffective and don't protect women. But couldn't you bring a civil action for assault and battery? I think the record, the country conditions evidence says, no, you can't do that in Honduras. That's not an effective means of protection, and the police don't take... Does the record bear that out? Yes, Your Honor. The country conditions evidence bears that out. Did you try to file a complaint of some sort against this individual? If he's obsessive or some kind of monster, and I don't know, he may well be. There are just all sorts of correctives in the law, but the asylum statute doesn't seem to fit here, simply because of the universality of this unfortunate form of too often masculine behavior. Your Honor, are you talking about a legal action in Honduras? I'm talking about an action anywhere. So, given that this happened in Honduras and he's under the jurisdiction of Honduras, I'm not able to bring an action in there. And so, yes. So, for the purposes of here, I think we're just talking about asylum and withholding. But more importantly, it seems the record does indicate that the IJ, neither the IJ nor the PIA considered the country condition evidence. And that goes to the heart of maybe what Judge Wilkerson has addressed. Yeah, if you can get the police or someone to help you, yes, that's an avenue. But that's not an avenue, at least under this record. At least it's a factual question as to whether it is. It's not an avenue. If she could do that, yes. But she's not in the United States down in Honduras. She's in a different country with different conditions. And I don't see where the IJ nor the PIA considered that evidence. That alone seems to be a ground to remand the case for the consideration of that. I agree, Your Honor. That's correct. The agency never even discussed the country conditions evidence. And Alvarez-Lagos says that the agency must consider the facts holistically with an eye to the full factual record. They didn't do this here. So here, his words, his actions, the fact that this was based on, first, a sexual romantic interest. I see my time is expiring.  This was based on a sexual romantic interest, which has a connection to sex, as well as the country conditions evidence. I think that compels a finding of nexus to these particular social groups defined by sex. And at the very least, it was legal error that the agency didn't ask the right question of why her and not another person targeted. Ms. Sangueza, before you sit down, two questions. This argument about the agency not considering country conditions, was that made with respect to both the asylum claim and the CAT claim, or just the latter? Yes, Your Honor. To both the asylum claim and the CAT claim, in our opening brief, pages 36 to 38, we talked about some of the country conditions evidence in the record and how that supports a finding of nexus. And then the second question is, you've said this twice, that the country conditions evidence coupled with the statements that this individual made to your client compels the conclusion that the reason why he was pursuing her was because she fell within one of the social groups that we assume is correct for purposes of this appeal. There's a difference between being compelled to one result and one result only and having persuasive evidence that might lead a fact finder to one of two reasonable results. Why does this evidence compel that result? I find that it compels this result because here the agency's own factual findings refute the conclusion. The things he said to her, like, no woman, you're not allowed to behave this way. That's similar to in Chica's Machado, where this court found a nexus to religion, where the gang was extorting the petitioner because they thought that since she was a Christian and went to church, she could be a good lookout for her. And they said, because you're a Christian. That's a classic protected social group, but you said yourself, it's not enough that she was a woman. It has to be that the reason he pursued her and was obsessed over her was because she was a Honduran woman. And the second category was a single mother. So what's the evidence other than the country conditions? Is that it? So, I mean, it's the country. There's nothing from his mouth, right, from the assailant's mouth, that leads you to that conclusion of standing alone, does it? I think the fact that they're both Honduran, they're in this society, and I think also her past. You think that's enough without the country conditions? I think you have to consider the country conditions under Alvarez-Lagos, Your Honor. And I think also her own past experiences of being horribly beaten by past partners, like her own lived experience of past violence, that's at least relevant in that it corroborates the country conditions about this. And as for the single mother piece, in Alvarez-Lagos, this court said that gendered threats like calling the petitioner a whore, which is similar to him using objectifying language like calling her a doll, the threats to kill the Alvarez-Lagos petitioner's daughter, that's the same situation here. Like there is a nexus to her status as a mother, as in Alvarez-Lagos, Your Honor. All right. Thank you very much. Thank you. Good morning. Good morning, Your Honors. May it please the Court. Anne Peterson, and I'll be discussing the Convention Against Torture piece with you this morning. The agency here made two central errors in its Convention Against Torture claim. Judge Diaz, you just pointed out one of the arguments, which is that it abused its discretion when it focused solely on the police report, on the existence of the police report, disregarded all of the evidence that proves the Honduran government acquiesced to her torture. Second, it imposed an unlawful reporting requirement that is at odds with this court's precedents. One problem with your acquiescence claim is that, you know, you didn't give the government any kind of chance to address what you're complaining about. You were going to file a police report, and then you actually fled Honduras one week later without ever returning to law enforcement. And so, how can it be said that they acquiesced in anything when you never, when you never filed a report you say you were going to, then you took off? That goes to my second point, Your Honor, and so I'll just skip over to that, which is that reporting is not required, but also I would point out a factual distinction, just clarification. She did file a report, and the police permitted her to file a report, but that's all they did. That's where the assistance stopped. They did not investigate her persecutor. They did not arrest her persecutor. They did not prosecute her persecutor. And in fact, he was allowed to remain free, and he attacked her within hours or days, and then he continued to stalk her. And when she called the police, they didn't even answer the phone. So she was not required under this court's precedent to wait in danger and continue making futile outreach to authorities that couldn't help her. Too often we're saying because government didn't solve a particular crime or didn't resolve a particular crime, that that's acquiescence, but that happens all the time in the United States and in every country. There are criminal acts that take place, and because of an absence of evidence or one reason or another, unfortunately the crimes are never completely solved. But that doesn't mean that the government, that every government failure to properly resolve some sort of possible criminal action is acquiescence. And I wonder whether, again, you've given them any kind of fair chance when you said you were going to report this thing and then you fled. You left the country one week later. She did report it, Your Honor, and that was where the assistance ended, and she identified her torturer. So they had a lead, and they didn't follow it. They did nothing. They offered her no protection, and then she was attacked again and stalked again and attacked again. And under this court's precedent, she's not required to persist in reporting if it would be futile, which it was, or if it would put her in greater danger, which it did. And I realize that I only have a few minutes, or a few seconds. Well, you're actually over your time, but I'll give you some. Apologies, Your Honor. I will just say in closing that just to the point about disregarding the country conditions evidence, in neither decision does the agent even mention the country conditions evidence. And the evidence, country conditions evidence alone, demonstrates acquiescence with an over 90% rate of impunity for femicide and violence against women. So we would ask that the court find that the evidence demonstrates acquiescence or at a minimum remand for consideration of the totality of the evidence under the correct legal standards. In the case of the acquiescence here, this is so different from those cases where we have found a possibility of acquiescence. And the government points to the Orellana case where the petitioner was rebuffed in her vast number of phone calls that were made to law enforcement over a 12-year period. And nothing like those circumstances are present here. Nothing. That is a unique scenario and really a horrifying one. But I would also note that in Orellana, she received some assistance. At one point, she was given a protective order, and it proved to be ineffective. But in this case, zero assistance was given. And in other cases like in Portillo and in Perez Morales, this court has reiterated that reporting is not required should it be futile or place the petitioner in greater danger as it did in this case. And if there's nothing further, then I will save the rest of our time for rebuttal. Thank you, Your Honor. Thank you, Ms. Peterson. Mr. George. May it please the court. Matthew George for the Attorney General. I'd like to reiterate the factual scenario that's going on in this case and what petitioner herself has identified as the motivation for why Roberto took the actions that he did against her. She over and over said it's because she rejected him. She said that in her credible fear interview. She said that in her asylum application, and she said that in her testimony. Now, in her testimony, she did use the word woman. She said, Roberto said, no woman rejects me. However, in those other instances where she explained why he was doing this, she did not use the word woman. She used language such as nobody rejects me because I rejected him. Nobody rejects him because I didn't want to sleep with him. What did he do? As I understand, he did sexual harass her, at least in terms of the language he used. I thought he also threatened her. I believe after she had rejected him, yes. He threatened to kill her? Yes, after she had rejected him. At least in my view, isn't it common sense that he was motivated, at least in thought, by her gender? He may have been motivated by her gender. It's not just gender. It's her membership in a group of Honduran women is what she has articulated as her group. She's a Honduran woman, and he's a Honduran man. I'm just trying to think, can you really contend that he would have done the same thing to a Honduran man? Depending on the circumstances, yes. For example, if he had wanted to be friends? But we don't have those circumstances here. When you turn to, you look at Title VII, we really don't have anything in the Fourth Circuit that deals directly with this kind of issue, gender. Title VII does, and it creates that presumption that you are talking about sex in the context of sexual harassment. Why is that not instructive, or at least guidance, in what's here? Well, Title VII has sex explicitly as a ground for the harm or for the improper conduct. But what I'm making is it makes a presumption that sexual harassment is connected to the sex or the gender of the person. And here you have a sexual harassment situation. We don't have anything here. We're sort of on a blank slate here. We haven't made that determination here. Why is that not something we can turn to? We have nothing else to turn to. But it seems like common sense can lead you there, but there it is in the statute. I think I have two responses to that question, Your Honor. First is, again, Title VII is a different statute. It does have sex explicitly as a ground. But we do that all the time. We look to other statutes for definitional purposes and determine, is there an analogy, is there some guidance we can get from it? Otherwise, we reach out on our own, hold clock, just sort of make up what it is. Oh, no, sexual harassment in the immigration context doesn't involve gender where there's no presumption. I mean, we do that on our own. We can make that call. Of course, we can do that. But we've got some guidance here in Title VII. I understand it's a difference, but there's some guidance. There's a definition there. We have a particular social group here. We have sex in Title VII. Title VII also requires other factual things like an employment type of relationship, a certain number of employees. There can be all sorts of different factors that come into play. But I'm only dealing with the gender aspect of it and the definition of sexual harassment. I understand it has all the other elements in terms of establishing a Title VII claim. I'm not trying to do that. I'm simply pointing to the definition of sexual harassment and how it presumptively incorporates or deals with this term, gender. I haven't looked deeply into how that presumption came about in the Title VII context. So I can't really speak well about that other than there is an explicit statutory basis for it. And courts have looked at it. I mean, that's a much more typical scenario in an employment context to have a co-worker, say, another co-worker. One of the things that concerns me is that we're not paying, as a general matter, we're not paying enough attention to what the standard of review is in these cases. And the standard of review is set forth by the Supreme Court is that we're supposed to affirm these cases and affirm the agency unless the record and the evidence compels a different reading or a different result than that was reached below. That is a stronger standard than abuse of discretion or clearly erroneous is you have to have the record compel a different conclusion. And, you know, but we've adopted a very picky posture toward these immigration cases. Oh, you might not have considered this little point, or you might not have considered this little point. And we're reviewing IJ and BIA decisions more, we're scrutinizing them more carefully, more particularly, more minutely than we do district courts. And the scrutiny is detailed to an extraordinary degree when the standard of review tells us keep your hands off unless the record compels a different conclusion. We have this very deferential standard of review and an actual practice of searching review that is more detailed than we apply in any other context. And that's become a real problem. Everything requires a remand because there might not have been this little point that was considered. And that's not the way the Supreme Court wants us to protect this. Elias Zacharias or whatever said you've got to deny these petitions unless the record compels a different conclusion. And the record here doesn't compel a conclusion. The statute is perfectly clear from the record what happened here. And that was that a private party rejected another, one person rejected sexual advances from another person. It was private behavior. The state wasn't involved. And the purpose of the asylum statute is to address state persecution. This is not a state persecution case. It is a disagreement and a very unfortunate unraveling of a romantic relationship or maybe not a romantic relationship but a sexual relationship between two private parties. And to say that there's something wrong with the record below is to open up, to open up this area to an extraordinary degree that it seems to me is at odds with the text and the purpose of the asylum statute. I wholeheartedly agree, Your Honor, with everything you've said. And the Supreme Court has reiterated your sentiments in a recent case called McDie. Do you also agree that legal conclusions are reviewed de novo? I do agree that legal conclusions are reviewed de novo. And would it be a legal conclusion to say that sexual harassment is presumptively because of sex? I can't say that in the Title VII context. That would not be... In Title VII, I'm saying, would it be, to hear, would it be a legal conclusion that we would make with de novo review that sexual harassment is presumptively because of sex? As a matter of law, no. As a matter of law. No. Well, that's a legal conclusion. Where's the fact? Where's the factual determination? Whether this activity is on the basis of her membership in a... That's not the conclusion. The conclusion is that sexual harassment is presumptively because of sex. That's a legal conclusion. That is not an issue in this case, Your Honor. That is not what's before the court, whether sexual harassment is on the basis of sex. We have a persecutor. We have a nexus that connects with the individual. And that nexus is connecting her as a Honduran woman in the context of the country conditions that occurred there. And speaking of the country conditions, how do you distinguish Alvarez-Lopez? It surely must compel us to send it back on that basis because that case requires the BIA and IJ to consider the country conditions. I don't see anywhere in the record where they did.  Well, there are two responses to that. First, in Alvarez... Give me the first response. Do you see in the record where the BIA or IJ considered the country conditions? As a straight yes or no, no. No, they did not. Is that not required under Alvarez-Lopez? It is not because petitioners never raise the country conditions to the board. And that's the argument we made in the 28-J letter I filed a few days ago. You look at their board brief, they never raised those country conditions to the board, either in the Nexus context or in the CAT context. They made conclusory allegations about country conditions. They never pointed to a specific country condition that says this is what supports my claim. So you're saying... They would just mention in country conditions, knowing what the IJ has done, the BIA could simply just ignore it. Do you think that's the import of Alvarez-Lopez? They failed to exhaust it by not raising it for the board. Now you're going to say the board erred for not considering something they never presented to it. That is not what this court has said about, or any court has said about, how the board operates. Mr. George, you raise an interesting point. I want to make sure I understand it. So the record evidence was the evidence presented to the IJ, right, which included the evidence of country conditions. You would concede that. But your point is that once the case went up to the BIA, notwithstanding that that evidence was in the record that the petitioner in this case had to point to that record and make the argument again that it made before the IJ, is that the point? Yes, Your Honor. What's your case, the case that supports that proposition? I believe it's Tepes, and the statute is 1252, or 8 U.S.C. 1252 D.1, that any issue, particularly a factual issue like that where a petitioner wants the board to consider evidence that the immigration judge allegedly did not consider, the petitioner needs to make that argument to the board to exhaust it in terms of judicial review. All right. Well, let me ask this. So let's assume that that had happened in this case and related to Judge Wynn's question and also to Judge Wilkinson's good point. I agree that, in fact, I asked your colleague on the other side that the fact that an adjudicator could have come to the result that the petitioner favored doesn't mean that that result was compelled by the record evidence. And so that's absolutely right. I mean, that's the standard. But you would agree, though, that if the record evidence included evidence of country conditions, substantial evidence of country conditions, and the adjudicator had said nothing about that, even after it had been brought to his attention, that's a problem for you, right? I agree with that generic proposition. The issue is, as Your Honor just stated it, of bringing it to the adjudicator's attention. That's our point here of they needed to bring that country conditions evidence, the specific evidence, not just, say, country conditions. They need to say what country conditions support their argument and make that argument to the board. They didn't do that here. And therefore, they failed to exhaust it. And the court should not consider it. That used to be a jurisdictional matter. It's no longer jurisdictional. But it means the court, because we're raising it, the court shouldn't address that issue and shouldn't decide this case on that issue. Early on, you were trying to make a distinction between what the petitioner said and you were indicating that the reason why this, what was his name, Roberto, pursued her was because she rejected him, just generically, and no mention of the fact that she was Honduran or a woman. So we have this particularized social group, which is accepted. We assume it's sufficient, even though you may have an argument about that. But that's not for us to decide. So working with that and the country conditions and Roberto's statements, why isn't that enough, assuming that that evidence was properly presented to the BIA? Well, I'm going to, assuming country conditions were exhausted, I'm going to talk about those as if I were the board. We need a connection between those country conditions and what is in Roberto's mind in this case. Just saying that something happens in a country doesn't mean this individual actor is acting in accordance with that. We have no idea. In fact, to the contrary in this case, we have direct evidence of why he's doing what he's doing. And she said it over and over because I rejected him. That's why he's acting. It's not because of country conditions or some generic mindset he might have about women or something like that. It's because this individual rejected him. I think your point is, I think the question is a good one. And I think your point is a good one. The country conditions is a very broad sort of nebulous kind of concept. And it would just take the particulars of the asylum statute and sort of blow it up into a very open-ended proposition. And I think you're absolutely right that simply mentioning, I don't think the issue is properly raised here, but assuming it was, it still seems to me valid to say what you said, which is that country conditions doesn't relieve us of the need to rigorously analyze the particular claim and the particular petition and whether this particular claim fits within a statute which has a particularized purpose. In other words, the general here does not relieve us of the analytical exercise demanded by the particular. And I think that is a very, the general conditions is a very slippery slope. And we have an obligation to draw this back into the particulars of the asylum statute. And it's for the same reasons that in terms of looking at future harm, a petitioner can't rely simply on bad country conditions that are generically applicable to everyone in the country because the requirement is individualized or particularized. And for those same reasons, we can't look at generalized country conditions and attribute that to this individual actor in this case, Roberto. It's all about what was he thinking, what was motivating him to take these despicable actions in this case. It may come in, but it comes in, it seems to me, as more of a secondary factor, as something that feeds in. But there has to be that foundation that is established first in terms of both the purposes and the text of the asylum statute. As you go along with the analysis after you've satisfied yourself as to that basic point, then the country conditions can come in. But it's not a leading indicator. It's a bit of a, it's more of a trailing factor when the foundations and the statutory foundations have been established. And I think that's the way a lot of courts have treated it under the proof schemes that the asylum statute requires. I agree, Your Honor. So I think that's a valid and relevant discussion with respect to the claim for asylum. But of course, we have the separate CAT claim, which has nothing to do, at least not directly with Roberto, but with the actions or inactions of the government. So if the BIA failed to engage with the country conditions evidence, and it wasn't exhausted, why isn't the result here to remand, notwithstanding that a proper adjudication we might have been compelled to affirm because the agency engaged with the evidence? But if it failed to engage with the evidence, why isn't the remedy to remand with respect to that claim? Well, here the agency did engage with the individualized evidence that Petitioner presented. She looked at, or the immigration judge and the board looked at what Petitioner actually did in this case. She made a police report, and the police took that report. There are some positive factors in terms of they took the report. There are some negative factors, maybe, in that she tried to call a couple times, and no one answered. But sort of as Judge Wilkinson pointed out, this time frame for all the events in this case is about a week, maybe eight days. And then she left the country. We simply don't know what happened after that. So we're left with this absence of evidence. And country conditions is not going to be something that's going to fill that in in this individualized, particularized situation. It seems to me, if a petition goes extensively before the IJ, lays out the country conditions, and then she goes before the EIA and states that the country conditions evidence shows that the Honduran government is not merely unable to stop abuse, but it's also willfully blind to it, that you would hear that even as a judge on this court. I mean, when you say it's there, someone has to say, well, what is that evidence? Rather than to just, well, I'm going to ultimately just rule against you because that tells me you haven't told me what the evidence is. I mean, this is a process in which we are seeking, as an element of justice to the whole process, not one in which we are trying to play cat and mouse and got you on it. And they didn't even address that. I mean, even if she didn't specifically say it, but to say that the country evidence shows that they not only didn't stop it, but they were willfully blind to it, there's nothing there that addresses that. And when you look at the attenuating cases that you point to, which is what you're going to do, I want to determine from those cases, did that individual say anything of that nature here? Even in a generalized waiver, or did they just not bring it up? Which is a wholly different situation. And because I want to, you know, when the other side gets up, often what happens is you say something, then I'm going to hear something on the other side. You're not going to have a chance to respond to that. And so I'm giving you a chance to respond to that. Is it really waiver, as you say, and to get that, of course, you have to present it to us properly to say that is the case. Or is it a situation that's a matter of degree that, okay, she didn't say all that, but she said country conditions, and she pointed to them, but the VIA did nothing. And when you look at Alvarez Locos, that's not the way this should go. That's a remand for them to consider it. And even if you do that, what's the big harm with that? I mean, at the end of the day, what we're trying to do is do the right thing, not just, again, a got you situation or this is a condition in which you can try to make it out that it's a romantic situation or not. It's surely not. This woman, there's all kinds of evidence of her in terms of previous situations. She's constantly being abused in many settings. This particular one, he's not just someone who's luring her with flowers, as it seems to be painted here, that this is a nice little thing. He's making advances. He's stalking her. He's coming up on her job. She not only rejects it, she's rebuffing it. She turns and goes to the police, and okay, it's a week later. Well, it's an imminent threat, and they do nothing. They just take the report. They look at it. They do nothing, absolutely nothing for a whole week. A week is a long time. It can be 10 years. You can be dead in a week like you can if you wait for 10 years on it. And so it's not just the delay in terms of the response of police. There's no response in that. And so when we look at the circumstances of this, this is what we get to the meat of it when we're dealing with the circumstances of this case. So I think that's a distinction. But respond at least to the contention that something was said here, and it was more than just a generalized statement. It was a statement that the conditions show that this government was not merely unable to stop abuse. It was willfully blind to it, and they ignored it. There's nothing there. Judge Diaz, may I have time to respond?  Judge Nguyen, I point you to JA32, which is the sole page where petitioners make their argument regarding country conditions for CAT to the board. And if you read what they said there, the skeletal sort of bare bones argument, they just conclusively say country conditions. I doubt this court would accept that from a litigant appealing a district court decision, essentially telling this court, you look through the district court record, you find the country conditions or evidence I'm talking about, and make an argument for me that supports what I'm trying to say. I come back here to the basic point of whose burden was it to make out the claim. And it's the petitioner's burden to make out an asylum claim, and it's the petitioner's burden to make out a CAT claim. And you have to produce some evidence that there's going to be a likelihood of torture if the individual is, if the petition is denied. That's a high standard, that there's going to be a likelihood of torture. And the petitioner bears the burden. It's not the government's burden to produce that evidence. It's the petitioner's burden. And the point is, this kind of passing reference and skeletal reference just doesn't make the case. Judge Yeas, may I respond? Sure. I agree. I agree, Your Honor. That's essentially the point we're making. But you have to come back to whose burden is it. It's absolutely petitioner's burden. One point on that. So you got an IJ where you got all this evidence. She then cites to that evidence and says, the evidence, the commission evidence shows that this is so. And you're saying that all of the evidence that is before the board from the IJ, they can ignore it, even if you reference it or say it. If you don't go back and repeat exactly what you said to the IJ and it's right in front of you, then they can ignore it. Is that essentially where we are? The evidence presented to the IJ that is referenced or pointed to before the BIA, the BIA can ignore it, even though it is looking right at that evidence. If it were referenced like Your Honor just said, no, I wouldn't be making this argument. The quote is, country conditions evidence shows that the Honduran government is not merely unable to stop abuse of women, but is weakly blind to it. That evidence is right there in front of you. It's not something out in space. And I'm saying when we go look at the cases you cite, I want to know is there anything like this in that case. Now it's one thing to not bring it up at all, but to have it right in front of you, that's an insult to justice. To have it right in front of you and all this evidence is there and I'm not even going to look at it, even though it's right there. And I can't do that and say, okay, you waived it because you didn't stand in front of me and pick up that document and read everything you just went before below. That is the standard they need to point it out. And that's the standard I believe this court would apply to, say, a district court record. If a litigant came before this court and just said, I presented the evidence to the district court, court of appeals, you go find it. You still have at the end of the day an obligation to deal with the particular claim that is before the court. The particular claim that is before the court is the petitioner likely to be tortured upon return. A likelihood, a likelihood of torture. And you can talk about country conditions and the like, but that doesn't relieve two things. It doesn't relieve the fact that it's the petitioner's burden and it doesn't relieve the fact that the court has a particular case and whether there's a reasonable opportunity that the government would acquiesce in the torture here. You cannot get away from the particulars of the case by citing some general condition. You cannot relieve someone of the burden of proof and the burden to bring forward evidence. And this, this wasn't, it wasn't done. I don't think she was restricted in any way from bringing forth evidence that there would be a likelihood of torture in her particular case. And we have to analyze these cases. We can't just, you know, talk about this generality and this generality. We have to analyze these cases in terms of the person that brought it up in a particular situation and who has the burden. And this is, it's the way we analyze every other case, every other category of case. All right. Thank you, Mr. George. Thank you. Your Honor, the first thing I'd like to address is the exhaustion argument that was raised for the first time two days ago in a 28-J letter. Ironically, it raises... You mean it wasn't in the brief? It was not in the brief. It was... You mean they didn't bring it up to us before the letter comes up? No. I would argue that it is an argument that is waived, but it's also factually incorrect. You said you waived it. You said you waived because when you went to BIA, you didn't recount all of the evidence you put to IJ. We did. We weren't counsel of the board, but the counsel at the board did raise these issues specifically. And I would point the court to the joint appendix at 29, where country conditions evidence is clearly identified, citing Joint Appendix 232 at paragraph 26, Claudia Herman Storfer. Also, she incorporated those arguments by reference into her cat argument at 32, stating, moreover, as is shown here in country conditions evidence, that the Honduran government is not merely unable to stop abuse of women, but is willfully blind to it. Additionally... Can you bring up the issue of waiver in a 28-J letter? Was that the way you bring up an issue that you missed on the brief? No, Your Honor. And I believe this court recently weighed in on that. Well, first of all, it was procedurally improper to raise an argument in a 28-J letter, and it was nonresponsive to the point of our 28-J letter, which was to call this court's attention to its decision in Guantique Romero. And additionally, it was inconsistent with another 28-J response from the government, which was filed on February 25, 2025, which had the opposite argument. The suggestion there was that the board obviously considered the country conditions evidence because it had cited to the brief in its decision. And so not only is it internally inconsistent, these arguments, but they waived it by not raising it in their previous brief. And it suggests to me that it's an acknowledgment that the agency did not consider country conditions evidence and that there really is not a defense for that. Counsel, let me get to this. Were you restricted in any way from developing the evidence around with respect to your CAT plan? I'm sorry, say again? Were you restricted in any way from putting on evidence or developing your CAT plan? I would say there's a separate argument there that is not before this court about how the immigration court hearing was conducted, but with respect to... I'm asking you whether you, in proceedings earlier in this case, before the IJ and the BIA and all the agency proceedings, were you restricted in any way from developing your claim under CAT? Again, I think there are issues before this court, and I would say that yes, but it's not before this court. So the answer is no? With the... No, the answer is yes, but... The answer is no, you weren't restricted. And I'm wondering why you didn't make more. If you think you've got a good claim, why did you not make more of it at the agency level? Why the CAT plan? Why didn't you develop it to a greater extent than is evident from what is before us here? Your Honor, I would say, I would posit that there is more than sufficient evidence here of government acquiescence on CAT, and also that she suffered harm that rises to the level of CAT, and that she faces torture, and that she faces future torture. The harm piece and the future torture piece are not before this court because the agency didn't consider them. However, the acquiescence piece is. And on this record, she has vet her burden, and the agency clearly erred by not considering any of the overwhelming country conditions evidence of impunity for violence against women. I see I'm running low on time, or I'm over time, but I'd just quickly like to address, if possible, the legal error in the nexus piece and a factual claim that the government made about statements on her statements about being a woman. Very quickly. She stated repeatedly that she was targeted in her testimony, that she was targeted on account of her sex. I would point the courts to Joint Appendix 211 and Joint Appendix 180. And I would also note that, at a minimum, even if the court determines that substantial evidence does not demonstrate nexus to the declared particular social groups, that, at a minimum, it should remand because the agency failed to consider, once it decided that there was a private or criminal motivation, it failed to consider whether or not one of the reasons, one central reason that she was targeted was also her sex. And failure to do so is inconsistent with this court's precedence, and therefore, at a minimum, should be remanded for consideration under the correct legal standards. And if there's nothing further, thank you, Your Honors. Thank you, Ms. Peterson. I note, and I think you mentioned this at the very beginning, or Ms. Sangueza did, that you are both pro bono counsel for Ms. Alfaro Celaya, and we appreciate your taking on her case and ably presenting it to the court this morning. And, Mr. George, thank you very much for your arguments this morning. We'll come down and greet you and move on to our second case.
judges: Albert Diaz, J. Harvie Wilkinson III, James Andrew Wynn